# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, B.T. PALMER**
Appellate Military Judges

## UNITED STATES OF AMERICA

v.

## MICHAEL S. BRIDENSTINE
## LANCE CORPORAL (E-3), U.S. MARINE CORPS

### NMCCA 201500041
### GENERAL COURT-MARTIAL

**Sentence Adjudged:** 10 October 2014.
**Military Judge:** Col D.J. Daughtery, USMC.
**Convening Authority:** Commanding General, 1st Marine Aircraft Wing, Okinawa, Japan.
**Staff Judge Advocate's Recommendation:** Maj J.M. Hackel, USMC.
**For Appellant:** Maj John Stephens, USMC.
**For Appellee:** LCDR Catheryne E. Pully, JAGC, USN; LT James M. Belforti, JAGC, USN.

**29 October 2015**

```
-----------------------------------------------------
            OPINION OF THE COURT
-----------------------------------------------------
```

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PALMER, Judge:

A panel of members with enlisted representation sitting as a general court-martial acquitted the appellant of committing a sexual act upon another person in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920, but found the appellant guilty of the lesser included offense of assault consummated by a battery, in violation of Article 128, UCMJ, 10

U.S.C. § 928.  The members sentenced the appellant to six months' confinement, reduction to pay grade E-1, forfeiture of $765.00 pay per month for 6 months, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.

The appellant now asserts the evidence is legally and factually insufficient.  After carefully considering the record of trial and the pleadings, we find the appellant's conviction to be factually insufficient.  Art. 66(c), UCMJ.

## Factual Background

On the evening of Friday, 14 December 2013, the alleged victim, Seaman Recruit (SR) CW, assigned to Naval Base Guam, was socializing in town with her friend, Corporal (Cpl) DR.  During the course of the evening, SR CW drank a shot of whiskey at their hotel before walking with Cpl DR to three bars.  At the first and second bars SR CW drank a total of two cocktails, a shot of whiskey, and a beer.[1]  At approximately 2200, they went to the third bar at where SR CW drank a mixed drink and two more shots and testified that she started feeling really drunk, that she spilled a drink, that she "felt like" she was slurring her words, and that she needed to lean on the bar for support.[2]  She has no further memories of the third bar, other than stating she "walked – somehow ended up on the other side of town," and passed out on a low wall.[3]

Although several witnesses testified SR CW drank heavily, no one says she was impaired to the level she describes.  In fact, Cpl DR, although intoxicated himself, testified that throughout the evening SR CW was not slurring her words or stumbling, could hold a conversation, and was walking around of her own free will.[4]  Captain (Capt) BP was at the last bar and recalls SR CW drank two or three mixed drinks, but that SR CW was not loud or slurring her words.[5]  Another officer, Capt CM, also saw SR CW consume these drinks at the third bar over the span of an hour, but when he left the bar around midnight, SR CW did not display any "warning signs" such as slurred speech or

---

[1]  Record at 283-84.

[2]  *Id*. at 285.

[3]  *Id*.

[4]  *Id.* at 238.

[5]  *Id*. at 253.

spilled drinks, and that he did not "have any concerns at all about [her] and her ability to understand what's going on, talk to people, [and] get home if she needed to."[6]  No evidence was presented as to when SR CW left the bar or how she traveled. There was no evidence the appellant was at any of these bars or that he had witnessed SR CW consume alcohol.

SR CW testified she had fragmentary memories of the rest of the night.  She next remembered waking up on a low wall, sitting up, and then being approached by two people.  It is unclear whether the people actually saw her lying on the wall before she sat up.  Although the Government infers the appellant was one of the two persons,[7] SR CW did not know either and did not recall if they spoke to her.[8]

SR CW's next memory is "being sat on a bed" in a dark room. She heard talking but did not know how many others were present. She asked about Cpl DR's whereabouts, said she could not find him, and stated she wanted to go.[9]

SR CW next remembers someone pushing her, in a "not rough" manner to lay her down and "running his hands" on her.[10]  Then, after another passage of time, she remembers a light was on and that she was on her hands and knees straddling an 18-24 inch gap between two beds.[11]  A white male was in front of her, holding her by the back of her head and "making [her] give him oral [sex]," while another man, of apparent Asian descent, was behind her penetrating her anally.[12]  Although SR CW recalls thinking the following day, that "what happened that night . . . wasn't something that [she] had consented to,"[13] SR CW did not testify that she manifested any objection, either verbally or otherwise, to the activity.  She also acknowledged on cross-examination that no one held her down, that she did not remember anybody

---

[6]  *Id*. at 246-47.

[7]  *Id*. at 419.

[8]  *Id*. at 285.

[9]  *Id*.

[10]  *Id*. at 286.

[11]  *Id*. at 286, 296, 299.

[12]  *Id*. at 286-87.

[13]  *Id*. at 288.

keeping her in the room, and did not remember anything she might have said to either man prior to and after the sexual activity began.[14]

SR CW next remembers waking up the following morning in one of the beds. A man (Sergeant (Sgt) BB) who she did not recognize was sitting on the other bed. SR CW testified that Sgt BB soon got up and found vomit on his bed, which she assumed came from her. She telephoned Cpl DR to come get her, and then watched a movie with Sgt BB as she "tried to figure out what happened the night before."[15] When the movie ended, she left the room and waited in the lobby for Cpl DR. Upon his arrival, Cpl DR, who believed SR CW had "ditched" him the night before, sarcastically asked a question to the effect of whether she enjoyed getting raped last night.[16] A short time later, after Cpl DR was "prodding at her to get some information," SR CW stated she thought she had been raped.[17] The following Tuesday she made a restricted sexual assault report, ultimately changing it to an unrestricted report.[18]

Sgt BB, a member of the appellant's unit, was billeted in the above-described hotel as part of a military exercise. His assigned roommate was Cpl MA, who Sgt BB describes as Asian. Sgt BB knows the appellant "from passing" or via a "professional relationship, and similarly has a "professional relationship" with Cpl MA.[19] On the evening of 14 December 2013, Sgt BB stayed in his room watching television and talking to his wife on the phone. He consumed no alcohol and was sober. He had a prior agreement with Cpl MA, that if Cpl MA brought a girl back, he would leave and let them use the room.[20] Between 0130 and 0200 on 15 December 2013, Sgt BB was awakened when Cpl MA, the appellant, and SR CW, who Sgt BB had never met, arrived at his hotel room. Sgt BB took about approximately 15 minutes to dress

---

[14] *Id*. at 299, 300.

[15] *Id*. at 288.

[16] *Id*. at 235, 289. Note: When Cpl DR asked this question he had no knowledge of SR CW's early morning interaction with the appellant.

[17] *Id*. at 235.

[18] *Id*. at 289-90.

[19] *Id*. at 257-58.

[20] *Id*. at 266.

4

and prepare to leave.[21]  Sgt BB testified the lights were on and they were "talking," "boisterous," "happy, having a good time," and "laughing together."[22]  He believed they had all been drinking, but that no one, including SR CW, was slurring their words.  He stated SR CW had her arm around Cpl MA in an affectionate manner and that Cpl MA was not holding her up.  He further stated he understood his responsibility as a noncommissioned officer and saw nothing in the situation that set off "warning flags" or "alarm bells."[23]

Sgt BB returned to the room at approximately 0500.  He saw Cpl MA and SR CW asleep in the same bed and that she had her head on his chest in what he described as "cuddling."[24]  The appellant was gone.  While SR CW was still sleeping, Sgt BB testified that he stripped his bed linen after finding an unidentified "nickel-sized" stain on his sheets which he said could have been vomit or salsa.[25]  He saw no other evidence that anyone had been sick in the room and he went to sleep in his bed.

Sgt BB testified Cpl MA left for work at 0600 and that when he awoke at 1000 SR CW as still sleeping in Cpl MA's bed.  He smoked a cigarette on the balcony and when he returned SR CW was in the bathroom.  When she came out, Sgt BB testified she sat on Cpl MA's bed, watched a movie that lasted 90 minutes to two hours, ate a snack, and they engaged in light conversation.  He described her as pleasant and testified that she said goodbye when she left.[26]

The remaining relevant facts were developed during the ensuing investigation pursuant to SR CW's report of sexual assault.  A medical examination conducted three days after the alleged assault revealed SR CW had tenderness on the back of her neck, some bruises on her forearms, redness on her right breast,

---

[21]  *Id*. at 267-68.

[22]  *Id*. at 262, 267.

[23]  *Id*. at 269.

[24]  *Id*. at 263, 270.

[25]  *Id*. at 270.  This testimony differs from SR CW's, who said Sgt BB discovered what she described as vomit in his bed after she woke up the following morning.

[26]  *Id*. at 264, 271-72.

5

and very small lacerations on her genital area.  Expert opinion testimony stated these lacerations could have resulted from consensual or nonconsensual sex. [27]  Forensic DNA testing confirmed the presence of the appellant's semen on SR CW's bra and underwear. [28]

The appellant and Cpl MA were separately tried for sexually assaulting SR CW. [29]  At the appellant's trial, the trial judge *sua sponte*, without objection from either party, instructed on the lesser included offense of assault consummated by a battery and a mistake of fact defense thereto. [30]  The members, using exceptions and substitutions, found the appellant guilty of assault consummated by a battery in that he wrongfully did bodily harm to [SR CW] by inserting his penis into her mouth with unlawful force or violence and without her permission or consent." [31]

The appellant now asserts legal and factual insufficiency because the Government did not prove the alleged victim's lack of consent beyond a reasonable doubt and, alternatively, because the appellant held and honest and reasonable mistake of fact as to consent.

## Analysis

Under Article 66(c), UCMJ, we conduct a *de novo* review of factual sufficiency on all cases before us.  *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves convinced of the accused's guilt beyond a reasonable doubt.  *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).  "Such a review

---

[27]  *Id*. at 316-17.

[28]  *Id*. at 348, 350-51.

[29]  Appellant's Brief of 15 Jun 2015 at 12.  Although mooted by our present action, we note neither the SJAR nor the CA's action includes reference to Cpl MA's companion case and his resultant acquittal as required by the Manual of the Judge Advocate General, Judge Advocate General Instruction 5800.7F § 0151a(5) (26 June 2012).

[30]  *Id*. at 395, 407-09.

[31]  In reaching this finding the members excepted the words, "commit a sexual act upon [SR CW] to wit: Inserting his penis into her mouth when [SR CW] was incapable of consenting to the sexual act due to impairment by drug, intoxicant, or similar substance."  *Id*. at 436, 437, and AE XVIII.

involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

## Factual Sufficiency

The elements of assault consummated by a battery are: (1) that the accused did bodily harm to a certain person; and (2) that the bodily harm was done with unlawful force or violence. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 54b(2). The "bodily harm . . . must be done . . . without the lawful consent of the person affected [and is defined as] any offensive touching of another, however slight." *Id*. at ¶ 54c(1)(a). As a general matter, consent can convert what might otherwise be offensive touching into non-offensive touching, and a reasonable and honest mistake of fact as to consent constitutes an affirmative defense. *United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000) (citation omitted).

It is not the appellant's burden to prove that SR CW consented to the touching; "rather . . . the burden [is] on the Government to prove each and every element of the assault consummated by a battery, one of which is lack of consent." *Id.* at 69, n.3. Accordingly, even accounting for not having seen and heard the witnesses, for the reason's set forth below, we are not convinced beyond a reasonable doubt that the Government proved a lack of consent.

Although there was evidence SR CW was intoxicated, we find no compelling evidence that she was so drunk as to prevent her from expressing her lack of consent to the touching (here, the sexual activity with the appellant). Every Government witness who saw her drinking that evening (Cpl DR, Capt BP, and Capt CM) testified that SR CW was neither slurring her words nor stumbling, that she was engaging in conversation, and that they had no concerns about her ability to understand what was going on around her. Upon leaving the last bar it appears she walked, on her own, some significant distance "to the other side of town." Sgt BB, another Government witness, testified that SR CW was happy, talking, laughing, not slurring her words, and that she had her arm around Cpl MA in an affectionate manner. Thus, the evidence indicates that her presence in the hotel room with the appellant and Cpl MA was both knowing and voluntary. SR CW's testimony also indicates she was sufficiently alert to be fully aware of her exact location in the room and that during

7

the sexual activity she was supporting her own weight while balancing in a difficult body position. Further, SR CW states that during the sexual encounter she was awake, the lights were on, and although she testified the appellant was "making"[32] her perform oral sex, no evidence was presented that she demonstrated to the appellant or Cpl MA, in any manner, at any time, that she did not consent to any part of the encounter. Moreover, no evidence was presented to indicate SR CW was, through any means, prevented from manifesting her lack of consent or objection to the situation. To the contrary, we note SR CW spent the remainder of the night with Cpl MA, one of her alleged attackers, sleeping with her head on his chest.

Recognizing the high burden the Government carries in a criminal prosecution, and after considering all the evidence and pleadings in this case, we find the Government did not demonstrate the complainant's lack of consent to the touching beyond a reasonable doubt and therefore failed to prove the offense's second element beyond a reasonable doubt.

### Conclusion

The findings and sentence are set aside. The charge and specification are dismissed with prejudice.[33]

Senior Judge FISCHER and Judge KING concur.

For the Court

R. H. TROIDL
Clerk of Court

---

[32] *Id*. at 286.

[33] Our granted relief moots the appellant's argument that he possessed an honest and reasonable mistake of fact as to CR SW's consent and that his conviction was not legally sufficient.

8